**ST. JOHN'S REGULAR BAPTIST ASS'N
et al. v. LONG.
No. 9714.**

Court of Civil Appeals of Texas. Austin.
April 28, 1948.

Rehearing Denied May 19, 1948.

W. J. Durham, of Dallas, for appellants.

R. J. Long, Looney & Clark and R. Dean Moorhead, all of Austin, for appellee.

RAYMOND GRAY, Justice.

This is an action in trespass to try title to 14.06 acres of land in three parcels, described as portions of the James P. Wallace League No. 57 in conflict with the T. J. Chambers Survey, in Travis County, Texas. The action was brought by R. J. Long against the St. John's Regular Baptist Association and the Orphan Home of the St. John's Regular Baptist Association, both Texas corporations.

In 1900 defendants purchased 200 acres of land out of the above Survey from George W. Walling, Jr., and P. C. Wells. The same year L. L. Campbell purchased 106.5 acres of land out of the same Survey from said Walling and Wells. The 106.5-acre tract joins the 200 acres on the south, and at the time of the purchases there was a fence running from the east to the west across the south part of the 200 acres, but not on the true boundary line of said two tracts of land. A railroad track runs across the Campbell land from the south to the north and divides the same approximately 73 acres to the west of the track and 33 acres to the east—this 33 acres is referred to as a 23-acre and 10-acre tract. The parcels of land in controversy lie on each side of the railroad and south of the fence, but north of the south boundary line of the 200 acres.

In 1900 L. L. Campbell was a trustee of defendants and continued to be such trustee until his death in 1927. Upon the death of L. L. Campbell, his land passed to his wife, Mrs. Ella Campbell, who continued, through tenants, to use and cultivate the land south of the fence until August 28, 1945, when she sold 30 acres east of the railroad to R. J. Long and wife, and on September 23, 1946, by quitclaim deed, she conveyed the land in controversy to R. J. Long.

The trial was to the court and judgment rendered that plaintiff recover of defendants the title and possession of the land. The defendants have appealed. At the trial the parties stipulated the land in dispute is within the area described in the deed to defendants, and that the common source of title is George W. Walling, Jr., and P. C. Wells. Findings of fact and conclusions of law were not requested and none were filed.

The question presented for review is whether or not there is any legal evidence to support the trial court's judgment awarding title and possession of the land to appellee on his plea of limitation under the 10-year statute. Art. 5510, R.C.S.

■■  Since L. L. Campbell was trustee for appellants at the time of the purchase of the 200 acres of land, and continued as such trustee until his death, his use and occupancy of any portion of the same would not start the running of limitation against appellants (we do not imply by this statement that the record before us suggests any such intention on his part), but his possession would inure to the benefit of appellants. Sullivan v. Fant, Tex.Civ.App., 160 S.W. 612, Error Reference. Mrs. Ella Campbell succeeded to the same possession as was held by her husband. Her holding would not be adverse until she repudiated appellants' title and asserted an adverse and hostile claim. Carter v. Town of La Grange, 60 Tex. 636.

The land was used and cultivated by Mrs. Campbell, through tenants, in the same manner as it was during the lifetime of L. L. Campbell, and she exercised no more adverse use or claim than L. L. Campbell had exercised, unless it can be said the moving of the fence along appellants' south line to the south boundary line of the 200 acres and the replacement of such fence at its original location was a repudiation of the character of Mrs. Campbell's possession, was done under a claim of right, and was sufficient to bring notice to appellants of an adverse claim of title. It is appellants' contention that this was in the year 1940, and appellee's that it was in 1932 or 1933. These conditions are testified to by W. B. Campbell, who said: (On

direct examination) He managed the property as agent for his mother. Between 1931 and 1932 some members of "the Board" came to me over at Anderson High School, with a plat or survey, and claimed we had some of their property—I told them I didn't know anything about it and didn't give them any satisfaction as to that. Then some time after that the fence was removed. "The man on the farm came out and told my brother the fence had been removed, that is James Deen—my brother went out there and replaced the fence." It was perhaps six months or a year after they came out to the school that the fence was torn down. They tore down the fence north of the 10-acre tract and the north fence of the 73-acre tract. "They tore down the north fence all the way through, the fence which is the north part of our property—runs east and west. I didn't see them tear it down." But I went out and saw that the fence had been removed the same day—the same day they were tearing it down. I don't know who they were; they claimed to be St. John's. It was Rev. Black, Rev. Marshall, who is deceased, and Rev. I. M. White who came to see me at the school, and a couple more, I think, I don't remember the others. To the question: "You saw the fence was removed and you saw them in the process of erecting another fence down there?" He answered: "I did." Through my brother I instructed my agents what to do about the fence. It was replaced.

On cross examination this witness first testified: That Rev. Black and the others talked to him at the school. "They have never been to me any more about it." And then: "Q. You never have talked to anyone about the Orphan Home owning property south of that fence? A. No, I don't remember. I don't recall talking to anybody. Q. You don't recall. A. No, not just now." And further: "I didn't say anyone replaced the fence; I don't know who took the north fence down. I said perhaps they were agents of St. John's, but I didn't say I saw them replacing it. I saw it after it was removed. I didn't see anybody replacing the fence or tearing down the fence. The fence was torn down

and put there south and we had it replaced." He had read the deed, and in paying taxes he paid on 106 acres, more or less, and thought he was paying on what was under fence.

Mrs. Ella Campbell testified she did not know anything about appellants' property, she had seen the fence, but had never examined anything around the property. She claimed all lands L. L. Campbell had in his possession.

Appellants' president, A. K. Black, testified a loan was obtained on appellants' land in 1929, at which time a survey was made and it was then determined a portion of the 200 acres was south of the fence. This was made known to W. B. Campbell in 1932 or 1933, who said he would "look the matter over with my attorneys." It was surveyed again in 1940 by O. Leonard. W. B. Campbell was talked to about this survey and said he would govern himself accordingly with the survey. The fence was moved in that year.

To the same effect is the testimony of J. H. McClean.

G. H. Wright testified he moved on appellants' property January 12, 1938; that he, his son, and Sherman Hughes moved the fence about two years after he moved on the place. They moved only the fence east of the railroad; it was moved one day and the next morning it had been moved back to where it was; he didn't know who moved it back. That was in 1940. The fence west of the railroad was never moved.

F. R. Hale testified as a witness for appellee and said: He leased the Campbell land west of the railroad in 1939, and has used it since as an air port. He has been out there most every day and does not remember seeing any one tearing down a fence east of the railroad; he could not be positive but he didn't recall seeing any surveyor out there in 1940, and said, "I would rather say since 1942."

J. C. Campbell, who had charge of the property east of the railroad for the years 1931, 1932 and 1933, and James Deen, who was Campbell's tenant of the property west of the railroad for said years 1931, 1932

and 1933, did not testify; neither did Arthur Wright, who was Campbell's tenant for the year 1940. Sherman Hughes and the Wright boy who helped G. H. Wright move the fence were not called as witnesses, and no reason is given why these named parties were not called.

A plat of the survey claimed to have been made in 1940 is in evidence and shows: "Surveyed by O. Leonard, Licensed Civil Engineer, in 1940."

The above is a summary of the evidence and shows the first hostile act, if any there was, against appellants' title was the replacement of the fence after same was moved by appellants' agents. W. B. Campbell's testimony shows he knew very little about the fence-moving, but did say it occurred "perhaps six months or a year" after the conversation with A. K. Black and others at Anderson High School, which he says occurred "between 1931 and 1932." This compels the conclusion the trial court accepted the testimony of W. B. Campbell that the fence incident occurred in 1932 or 1933, and was sufficient to bring notice to appellants of an adverse and hostile claim.

■ Appellants do not claim that the judgment is so against the great weight and preponderance of the evidence as to be clearly wrong, nor that the evidence is insufficient to sustain the judgment; but the assignment is: There is no legal evidence establishing title by limitation. Since we can determine only what is before us, we must look to the testimony tending to support the court's finding, and uphold the judgment, if there is any legal evidence to support it. W. B. Campbell testified the fence was moved and replaced in the year 1932 or 1933.

■ In order for appellee to sustain his plea under the ten-year statute of limitations, three facts must be established: (1) Mrs. Ella Campbell having succeeded to the possession held by L. L. Campbell, whose holding was not adverse to appellants, there must be repudiation of that possession and the claim of title adverse to appellants; (2) this repudiation and adverse claim must be clearly brought home to appellants for limitation begins to run only from that date; and (3) there must be adverse possession for ten years after notice of repudiation and adverse claim has been so brought home. Davis v. Lund, Tex.Com.App., 41 S.W.2d 57. These requirements, nor any one of them, cannot be found in the testimony of Mrs. Ella Campbell, but must be found, if at all, in the testimony of her agent, W. B. Campbell, whose authority, acts and declarations she does not, in her testimony, authorize, ratify, claim or approve. The statement of W. B. Campbell made to members of "the Board" between 1931 and 1932, was not a repudiation of appellants' title, nor was it notice of any character of adverse claim. When he was advised by "the Board" that Campbell had some of the Orphan Home's property, he said: "I told them I didn't know anything about it, and I didn't give them any satisfaction as to that." This leaves only the evidence that the fence was moved by appellants' agents and was replaced. There is no legal evidence as to who did the replacing, and certainly none as to why. W. B. Campbell said: "Through my brother I instructed my agents what to do about the fence." This evidence, together with the fact that the fence was replaced at its original location, may be accepted as sufficient to circumstantially establish the fence was replaced by agents for Campbell. But to say this was a repudiation of prior possession, and, standing alone as it does, sufficient to constitute notice to appellants of an adverse and hostile claim against appellants' title, would be invading the "domain of conjecture." After the fence incident there was no change in the use of the property, and no more claims or acts of ownership exercised than before. W. B. Campbell said James Deen, a tenant, came in and told "my brother" the fence had been moved. So far as the record discloses, it is just as logical to assume the fence was replaced to appease an angry tenant as to assume that it was done under a claim of right, and as an adverse and hostile act against appellants. In the conversation with the members of the Board, Campbell made no claim to the land, and

nothing was then said which would constitute notice of an adverse holding. If since that time he has changed his mind and has decided to claim the land adversely, he did not in his evidence say so. The possession having been once held (by L. L. Campbell and then by Mrs. Ella Campbell) in subordination of appellants' title, it could not become hostile and adverse until repudiation is clearly brought home to appellants. " * * * peaceable possession, even when accompanied by acts whose prima facie import is that of hostility, may not, in truth, be adverse, for intent (of the possessor) may bring his acts, etc., into consonance with recognition of the privileges of true ownership. Intent, then, is a controlling factor. Purpose kept intimate (through lack of overt acts, etc.) to the possessor is, of course, nonobligatory upon the true owner, for in such event there is lack of requisite notoriety." Thompson v. Moor, Tex.Com.App., 14 S.W.2d 803, 804.

To say the replacement of the fence under the conditions reflected by the record here meets the requirements of law is to say there is legal evidence meeting the requirements set out in Davis v. Lund and Thompson v. Moor, supra. Since the replacement of the fence by Campbell's agents is proved circumstantially and not by direct evidence, the other elements to establish appellee's plea cannot be inferred: " * * * the circumstances themselves must be shown by direct evidence, and cannot be inferred from other circumstances. It is not admissible to go into the domain of conjecture, and to pile one presumption upon another." Missouri Pacific Ry. Co. v. Porter, 73 Tex. 304, 11 S.W. 324, 326; Paris & M. P. Ry. Co. v. Russell, Tex.Civ.App., 104 S.W.2d 650.

The testimony of A. K. Black, as explained by him, shows only that Campbell's holding was subject to future determination by attorneys and surveys. For this reason his evidence is not acknowledgement of an adverse holding under a claim of right.

The assignment is sustained and the judgment of the trial court is reversed and remanded.

Reversed and remanded.